This is the Court, Phil Talmadge representing the Gardner Appellants, joined by Hal Schofield at Council Table. I'd ask, Your Honor, if I could reserve five minutes of rebuttal time. Okay, and watch your clock. I will do. This case, as the Court knows, is a case involving SBA disaster loans to the Gardners, and factual questions in this matter abound as to whether the conduct of the SBA and LPP Mortgage was in violation of the implied covenant of good faith as to the loan agreements, such that the SBA and LPP acted arbitrarily and capriciously in canceling previously approved loan funds, in failing to timely act on loan fund increases, and in refusing to reinstate the loans once the loans were canceled. All of these would obviate the summary judgment granted in favor of LPP in this matter. To compound the problem present in the case, the District Court in this case failed to even address the issue of loan guarantees, and nevertheless found that the guarantors to the loan obligations were liable as a matter of law, where the Small Business Administration and LPP acted in such a fashion as to willfully cause waste or deterioration in the collateral that's at issue in this case. We ask the Court reverse the District Court judgment for all of those reasons. Let me start first with the issue of the loans that existed here between the Small Business Administration assigned to LPP and the arbitrary and capricious conduct by SBA and LPP in connection with those loans. There is no question but that the purpose of these loans was to deal with the problem of a disaster. The gardeners had experienced this terrible set of circumstances in January of 1996, and their motel mobile home park slash RV park had been substantially damaged as a result of those disastrous floods that took place in Northwest Oregon that year. These disaster loans were designed to deal with those problems from an economic standpoint that the gardeners experienced. That was their purpose. They couldn't get commercial loans elsewhere to deal with the problems. They got those loans. The SBA agreed that the gardeners were entitled to the loans, and there were two distinct loans that were issued here to the gardeners. Under these circumstances, we have a very interesting set of circumstances. We have the Small Business Administration granting the loan, recognizing the problem. The gardeners provided information at the time of their loan application indicating that there was a problem that was taking place with respect to a motel in Klamath Falls. So the Small Business Administration was aware of that issue and said the existence of that litigation was not an issue. But wait a minute. Not an issue in what sense? I mean, it was at that point to say that something hasn't been reduced to a judgment is not the same as saying we're aware of the litigation. That's not an issue. They may have said we're willing to either look at it and we know that there's a potential liability out there. We discount the liability. Or they may have said we recognize that they're probably going to lose on that, but the evidence doesn't seem to suggest that the SBA assumed that a judgment and some amount of money was going to be entered in that case. Does it? Actually, I would disagree. The evidence here indicates that the SBA treated the existence of the Klamath Falls litigation, the litigation associated with the Klamath Falls motel, as if a judgment had been entered. In what amount? It didn't say. Well, how would they factor it into their underwriting? Well, it understood that there was this particular set of circumstances that was going on. Sure, but that's not the same as saying it could be that they'd get a non-suit or it could be that they got hit with a million-dollar judgment. You think that the SBA doesn't care about the potential of a large judgment? No, obviously the SBA would, Your Honor, and that's not the problem here. The problem is the SBA assumed that a judgment had been entered. Are you basing that on a small judgment? Well, you keep saying that in your briefs. But first of all, it also said those judgments were satisfied, which makes it seem that they're talking about some different judgments, and they were talking about the individuals, not the company. So they never said with regard to the company that there was a judgment, and they said that the judgments they were talking about were satisfying. Well, it said it made mention of the existence of the judgments. And said they were satisfied. But then it was placed on notice subsequently, Your Honor, in January of 1997. There was a request for an increase in the loan amount, and at that point stipulated settlement and judgment. No, there wasn't a judgment yet either, because the agreement was that there would be a judgment in March. But in the letter that was sent by Alice Randall to the Small Business Administration at the record at 326-332, she indicated that there was no possibility that they would be able to pay the amount of the stipulated settlement, and the likelihood of judgment was significant. And at that point we then knew the amount of the judgment from the standpoint of the Small Business Administration. The point here is the loan was granted, the two loans were granted. They were granted with the knowledge of the existence of this Klamath Falls Motel problem. They were advised specifically regarding the settlement in January 1997. After the January letter, did they give her more money? Did they give them more money? Did they what? Did they give them money to pay the judgment? Yes, they did. The Small Business Administration granted them additional money February 28th of 1997. Then what happened? Then they didn't pay it. Well, at that point they were in the middle of the construction season. They were in the middle of construction. The Small Business Administration had been approving activities relating to construction. So they gave them money on the assumption they would then use it to repay the judgment. There wouldn't be a judgment. But, in fact, they didn't use it to repay the judgment, and there was a judgment. Well, they were giving them the money for purposes of pursuing with the reconstruction of the Gardner Motel RV Park mobile home park. They were giving the money for the reconstruction purposes at that point. It didn't have anything to do with the repayment of the Klamath Falls litigation. I thought that's why she asked for it. She asked for it saying that we're not going to be able to pay this back without more money. They needed more money to proceed with construction was the reason I understood, Your Honor, from the record as to why they wanted the money to be able to proceed. The idea was that they needed to have the money to proceed with construction. The SBA had been advised that the construction was going to start on April 1st, 1997. So they had a specific indication that there was a need for the money for construction-related reasons, and that construction was going to proceed apace, and the SBA was aware of it. In April of 1997, you have this notation in the record, April 7th, 1997 at record 495, where there's the first indication that the SBA goes, oh, my goodness, here's this judgment that we have to be concerned about. Ironically, the loan officer on April 27th, 1997, on the very same day, issues a cancellation of the loans and approves additional funding at that point. You have this completely contradictory activity on the part of the Small Business Administration on that very day in response to this information. The point we have here, I think, is this, that there is an obligation under Oregon law to look to the question of good faith on the part of a party to a contract. We have two parties to a contract here, and the implied covenant of good faith requires that in the exercise of any discretion associated with the administration of the contract that the parties act in good faith, consistent with the reasonable expectations of the parties. The gardeners here had a reasonable expectation that they would be able to work with the Small Business Administration to facilitate the reconstruction of their disaster-impacted motel RV mobile home park. We have from the SBA side this utter inconsistency. Yes, no, about face, about turns, information that they had in their possession, and we have no clue about how they exercised their discretion under these circumstances. Can I come back again for a minute? Yes, Your Honor. The January 10th letter from Ms. Randall does say that she's tried to find financing for the $185,000, but because of the SBA blanket she can't get it. So is it possible that the SBA would fund either $281,000 and be in second position or $548,000 and be in first position? So what happened after that? Did the SBA give them more money then? The SBA gave them more money in February of 1997, the EIPL loan. So it was a response to that request, which was for financing, and then they didn't use it for the financing. So isn't that a change in circumstances? No. The adversity, the adverse change that was talked about was the existence of a judgment. There was no indication of anything other than the presence of the judgment being the adverse change. Right, but there was only the presence of the judgment because after representing that they were going to use this money to pay off the motel and therefore there wouldn't be a judgment, they didn't use it for that, and then there was a judgment. The monies were being used, Your Honor, purely for construction-related purposes. That may be, but I'm just reading what the letter says. That's not what it says. Well, we have that indication. Then we have further application for reinstatement from the Gardner side of this indicating that they dealt with the problem of this judgment. The judgment's satisfied. The Klamath Falls Motel is sold. We have evidence in the record that the SBA knew that, and notwithstanding the fact that they knew that, didn't even act on the reinstatement application consistent with the understanding that the motel had been sold. This is Mr. Goldstein's October 28, 1997 memorandum. The expectation these people had was a fair treatment by the SBA consistent with the implied covenant of good faith, that the application would be fairly treated, which it was, that the request for additional funds would be fairly treated consistent with the impending need to construct this project. Any efforts at reinstatement or additional funds would be fairly treated based on a fair assessment of the materials that were submitted. That didn't happen here. It didn't happen because the problem that the SBA itself identified was satisfied, and that is the problem of this adverse judgment was remedied in the eyes of the SBA. But on top of that, the SBA didn't even consider the fact that the motel had been sold as part of its consideration of the reinstatement issue. Hardly good faith under the circumstances under Oregon law. Are you going to deal with any of the terms of the contract that gives the SBA a lot of discretion in handling these requests in the context of what the expectations are of a party to those contracts? Doesn't the language of these contracts mostly define the expectation of the parties? I think it does in part, Your Honor, but I think the important point is that the terms of the contracts here gave significant discretion to the SBA about additional granting of loan funds and things of that sort. It certainly did with respect to reinstatement. But consistent with what Oregon law has found, the exercise of that discretion has to be undertaken consistent with a reasonable expectation. Well, they can sign a contract that says one thing and then expect another thing. Is that what the law of Oregon is? No. There doesn't have to be any kind of effort to obviate a contractual provision by this implied covenant of good faith, but the exercise of discretion itself has to be consistent with the obligation of good faith. And consistent with that requires the SBA to fairly consider the information given, to fairly assess it, and deal with it appropriately. We have here a circumstance where that isn't even the case. And under the circumstances here where we're dealing with this matter as a matter of summary judgment, this was something appropriately to be amplified upon and dealt with by the trier of fact in consideration of the issues. You can't look at that October 28, 1997 memorandum in which the loan officer admits, we didn't even look at the fact of the Klamath Falls Motel being sold and believe that the SBA acted in good faith with respect to the reinstatement issue when they had already determined previously in an earlier memorandum in October that reinstatement of both loans was appropriate. We have this about face that they've undertaken under these circumstances. Is the sale that you're talking about the one that was reflected in the May 20, 1997 letter? What sale are you talking about of the motel? The one reflected in the May 20, 1997 letter? There was a sale to the Concord Partnership. Yes, I believe that's the one, Your Honor. But the judgment that existed as to the Klamath Falls Motel is satisfied and there's a sale of the motel. Yes, and substantial financing with a new lien and so on, right? But the point is the Gardner appellants are off the hook in terms of any obligation for this. The judgment is satisfied, the judgment about which the SBA is concerned, and the motel itself is sold. Any obligation they have with respect to payments or whatever is gone. Who was going to pay the mortgage on that? It was taken over by the lender with whom the Gardners worked in that particular case. The motel was, in effect, purchased by the lender there. The Klamath Falls Motel about which the judgment was entered in that circumstance. They're off the hook is the point. The judgment that the SBA was concerned about is satisfied. These people are off the hook. There's no monthly payments on the funds. If not paid by July 30th, there will be a 2% interest accruing monthly. What does that mean? The lender in that particular set of circumstances took over the motel. That obligation was paid for by individual Gardner parties. They paid this out of personal funds. But at some point, the lender took over that obligation for the Klamath Falls Motel. These folks were off the hook for that obligation entirely. So that's the point here. The judgment about which the SBA is concerned is satisfied. These folks are off the hook. You have an indication from the loan officer that the loan should be reinstated with these people being back to their status quo ante. And nonetheless, the SBA decided not to reinstate the loan in October of 1997. There's a trustee note, April 30th, 1997, in which they promised to pay $210,000 on or before July 30th, 1997, signed by Jay Gardner and Jay Gardner and Carol E. Gardner. So how can they be off the hook? I'll get to the specific site when I sit down for rebuttal purposes, but there was a specific taking over of the obligation on the Klamath Falls Motel by the lender that was involved in that transaction. The Gardners were out of the picture entirely at that point, and the SBA was so advised. The last thing I wanted to point to was the issue of the guarantees here, and the district court's decision does not even reference the question of how the guarantors were liable as a matter of law for these loan obligations, particularly in light of the argument advanced by the guarantors that, with respect to this particular loan obligation, there's a fact question as to whether SBA and LPP intentionally caused deterioration in the collateral for their own benefit. With regard to that, as far as I can tell from the record, that provision is only in the guarantors' the guarantee agreements, and it's not in the agreement with the corporation. So, in other words, it doesn't run to the motel. Is that not right? Correct, Your Honor. We're only talking about the individual guarantors here. And it deals with their collateral, i.e., their homes and so on that they put up as collateral. That's my reading of it. The guarantors also had as collateral the motel itself. But that was not their collateral. That was the collateral of the corporation. There was also a question about the Kane condominium that was at issue in this particular case, too. What's the deterioration you're saying that they caused? Well, the deterioration that was caused here was that the Kane, because the SBA and later LPP had the ability to approve any sales of any of these assets, there were multiple efforts undertaken by the guarantors to mitigate their damages by selling the collateral so that they could satisfy the loan obligation. One of those transactions specifically actually provided for what would have satisfied the entirety of any loan obligation the guarantors had to LPP or to the Small Business Administration. But those were not approved. You're reading deterioration as something beyond physical deterioration? There was physical deterioration. There was testimony from Alice Randall in the record as we referred in our reply brief. There was actual physical deterioration in the collateral that she testified to that was caused because they could not get rid of them and mitigate the damages. But I think we can also infer that this was willful on the part of the SBA, and in particular LPP, because we have as a matter of record the 2001-2002 effort by LPP to come in and take the motel mobile home park, RV park, to purchase it at fire sale values, $124,000, to turn it around and sell it to someone else for $225,000, when there was a May 1998 SBA appraisal of this particular property that indicated it was worth $680,000. Can you show me where this language about reason of deterioration, how it pertains to the deed of trust on the 495 East Columbia River Highway? I don't read it as applying to that. It applies to the guarantees. The original loan authorization agreement says collateral, borrower will provide the following collateral, which is this deed of trust on the 495 East Columbia River. And then it says guarantee, and there are a set of guarantees by these individuals with collateral having to do with deeds of trust on what must be their homes, and then there are separate guarantee agreements, which have the willful act or willful failure language, but there doesn't seem to be any willful act or willful failure language applying to the borrower as such. But the point is I think that the guarantors guaranteed the loans and the collateral that was posted for the loans generally was the motel, RV, and the personal condominiums and so forth. But the agreement is only with regard to the guarantee and not with regard to the — in other words, the collateral on the guarantees are the other deeds of trust, not that deed of trust. But I don't think that in this particular circumstance you can have the creditor basically take the principal collateral item and cause waste or deterioration. That's a different question, but I don't think it's covered by the contractual language that you're looking at. The guarantor is guaranteed the entirety of the loan obligation, Your Honor. But the collateral on the guarantees was different collateral. I can't envision, I guess, a circumstance where the guarantees extended to the guarantor's obligation with respect to the entirety of the loan obligation and all of the collateral posted for that loan would be so limited. I don't think the language in any fashion indicates that it is so narrowly construed as to only apply to the particular items of collateral that they themselves gave as opposed to the other collateral that existed for the entirety of the loan obligation. Okay. I think we're going to—you're a minute already over time. Thank you, Your Honor. I'll ask you to move on. May it please the Court. My name is William Larkins. I represent LPP Mortgage and with me at council table is Robert Ackerman, in-house counsel from LPP Mortgage in Dallas, Texas. If I may, I'd like to begin addressing the issue of the implied covenant of good faith and fair dealing. We have no quarrel with the fact that that implied covenant is read into every contract in Oregon. But under the case law that established how that covenant applies, particularly the Talbert case and the Uptown Heights case, it is only the objectively reasonable expectations of the parties that bring that covenant into play. And as Talbert said, if the issue you're talking about has been covered expressly by your contract, your expectations of what might happen are, quote, irrelevant. That was the Talbert holding. In Uptown Heights, on facts somewhat similar to these, in a case written by Judge Graber when she was on the Oregon Supreme Court, said even though you might not like the fact that the lender is going to foreclose, even though the lender said the lender was going to work with you and then said, no, we're not going to grant you that second loan extension, if what the lender was doing was within the bounds of the express terms of the contract, then the lender was able to go ahead and do that. So in this case, you do have the express language of the loan agreements that says twice in a short space of a page that the loan disbursement decisions are made in the sole discretion of the SBA. So whatever it is that the borrower thought might happen, it was at odds with that sole exercise of discretion. Well, what about the point that Judge Berzan was talking to your opponent about, about the guarantee and not causing a deterioration in the value of the collateral? Their argument is that the SBA's actions caused the collateral to, in fact, deteriorate and worked at cross purposes. If that's A, does that apply here as a contractual term? And if so, why doesn't that create obligations of good faith that would be derivative from that clause? Okay. Your Honor, first of all, I think that in my general understanding of guarantee agreements that the argument the borrower or the guarantor is making is that any deterioration of the main collateral, be it the mobile home part or of the individual homes, could exonerate the guarantor from liability if the guarantor were able to make the requisite showing. I also think the covenant of good faith and fair dealing applies, but when you look at the way this SBA guarantee form has been interpreted by the courts, I think particularly by the Oustad case from this circuit, the Proctor case from the Fifth Circuit, what the language means is that the lender has to have intended to cause the physical deterioration of the collateral for the guarantor to be released from the guarantee liability. What if withholding funds for reconstruction happens? Why isn't that, in effect, physical deterioration? Well, that gets into, I think, the distinction between loss of value in the collateral, which these guarantees say is not change in value in the collateral under these guarantee agreements is not a basis to- Less market swings. I understand that. But to the extent that this whole program was to address a damaged property, to withhold the funds to put it back into usable condition certainly addresses the physical aspects of the property. It's not just a diminution in value. I mean, it's really the purpose of the program, to get it back on its feet. That would generate more economic and market value, I understand. That seems a fairly narrow distinction, particularly if that's what one leverages the good faith argument off of. Well, I think there are two issues that are coming together there, Your Honor. I want to address both. One is this decision whether to advance more monies for the continued construction, and I'll get back to that in a minute. But the case law is very clear that they're talking about an intent to cause harm to the guarantor by creating physical deterioration, and the guarantee language talks about waste, loss, or deterioration through fire, theft, or otherwise. Otherwise, right. Okay. Now, the context in which the guarantors have- Correct. By, you know, obvious things, but then, or otherwise. All I'm saying is, if that does apply to the relationship to the parties here, and I gather you agree with that, then we, under Oregon law, as I understand it, look to how the contract helps us understand the reasonable expectations. It seems to me that there's enough in that clause to say that the gardeners could, or the guarantors, could reasonably have expected that SBA would not intentionally prevent them from rehabilitating the project, that that was, in fact, causing the property to deteriorate. And, you know, one can parse it, then, and decide, you know, just the plain language. But if we're in that basis, it seems to me it's not unreasonable to think that the guarantors would have had the reasonable expectation that the SBA would not, you know, would not intentionally stand in the way of their undertaking the rehabilitation project. Well, Your Honor, I think it is a reasonable expectation on the part of the borrower and the guarantors to say that the SBA will not intentionally cause the harm to their property. Where the guarantors are raising this willful deterioration argument is in conjunction with post-default attempts by the borrower to get the SBA to release its deeds of trust. And as Judge Ashmanskas noted, there's no evidence that any of these proposed deals was going to result in the payment to the SBA, or later LPP, of what was owed. This is in the context of the loans having been declared in default and accelerated. Counsel, in opening remarks, made reference to a deal that was going to pay this off entirely. Well, that's not really true. What had happened was post-default in 1998, the borrowers brought a proposal to the SBA to have a third party resume making payments, not pay off the loans, but substitute in for the defaulted borrower. Well, under the Uptown Heights case and under Tolbert, the SBA had absolutely no obligation to do that. It could exercise its rights under the contract. What I don't understand about that is that, as I understand the whole function of the covenant of good faith and fair dealing, it is to deal with circumstances in which there is discretion, but to essentially say that discretion can't be exercised for ulterior motives or to destroy the purposes and value of the contract. So, for example, if a contract says you have complete discretion to do something, but you do it purposely to make it impossible for the other party to fulfill his contract, that's what I understood to be the core of the breach of good faith and fair dealing. Well, if there were evidence of that, Your Honor. Well, I understand that, but as you're describing the Oregon case law, you seem to be saying if the contract says that there's discretion, that's it, there's discretion. But I thought the whole point of the covenant of good faith and fair dealing is that even when you have discretion, you can't exercise it to defeat the ability of the opposing party to fulfill the contract. And I agree with that, Your Honor. The Best case gives two very good examples of how the discretion might be exercised improperly. One is the example the Best case gives of deciding not to renew a gas station lease for retaliatory reasons or to fire an employee because you know if you do so, you will avoid having to pay. So it isn't true that because a contract says it's in your discretion, that that trumps the covenant of good faith and fair dealing. Correct. But let's go to Tolbert as an example. The court said whatever expectations you could have about what bounced check fees might be were within the box that said the bank gets to set those fees and you've agreed the bank gets to set those fees. Here, we're talking about the exercise of discretion of the disbursement function. And a threshold question, if I can go back, is any of this disbursement decision making by the SBA even reviewable judicially? The Gifford case from the circuit, Gifford, on very similar facts says not reviewable. And I want to make a distinction. In their briefing, the appellant said, well, we agree that lending decisions by the SBA are not subject to judicial review, but only at the initial agreement and disbursement phase. Well, they supplied no support for that contention. And, in fact, Gifford and capital assistance hold to the contrary. Capital assistance said renewal is not subject to judicial review. And Gifford said, in a context where the SBA had previously loaned money and the borrower came back for more, and the SBA said, well, we're not going to give you everything you're asking for, but we'll give you some. That was subject to the discretion and was the statutorily permissive discretion and was not reviewable. And Gifford cited reasons for that. They said lending involves expertise and experience and judgment. We on the court don't have. So we're not going to get behind into the inner workings of why they made that discretionary decision to lend or not. And I'd like to apply that to something that was talked about during the appellant's remarks. The SBA did exercise discretion in a conscientious manner in this case. The court was asking Mr. Talmadge about ER 326 and 327, Ms. Randall's January 1997 letter. And one of the things she says about this judgment they might have to, that might be entered that they might have to pay is, we may have a sale on the property and not need any financing, but we need something by March 10th. Now, I would urge the court to look at page 490 of the record. I think this is a very important piece of paper. This is the February 1997 write-up of a loan officer named George Miller, in conjunction with that request by the borrower for more funds. And what it reflects, what 490 reflects, is this SBA loan officer has listened to the borrower's tale. And he says, I won't read much of it, As noted in the borrower's physical loan modification of an even date, borrower is required to pay a judgment of $160,000. They are presently trying to raise the money from a private source or sell the collateral property, perenn non-SBA related, to satisfy the complaint. Borrower does not feel this action jeopardizes their other projects and feels the matter will be appropriately settled. So what's the SBA doing? They're listening to the borrower and, frankly, being pretty sympathetic. They're adopting a scenario that's maybe a little rosier than warranted by the facts. And on February 28, 1997, they issue a letter saying, We're going to increase your economic assistance loan by $67,000. Now, those additional dollars did not get advanced because in early April, the SBA, having received in March a letter from the borrower that said, Well, you know, we're going to need $250,000 more than originally authorized to get this thing finished. Then in early April, the SBA finds out that not only has a judgment been entered for $185,000, we've got statutory interest running, we've got judgment liens on the SBA's collateral. And the write-up continues. The notes of the internal deliberations show not that the borrower's issues aren't being taken into consideration, but indeed that they are. Question. You say in your brief that the SBA has no authority. This is with regard to the sale of the properties, that they don't have to get the SBA's approval to sell the properties. But the loan agreements do seem to say quite the opposite. I stand correct on that, Your Honor. You're right. The loan agreements do say that. I also don't want to – I do want to say one more thing about the good faith covenant. And, Your Honor, mention this. In the best case, they said if you are exercising this discretion you've been given for purposes not contemplated by the parties, that's when you trip into bad faith. What's missing from this record? And here's where the appellants have the burden of proof before – they had it before Judge Ashmanskas and they still have it. There's no suggestion of an improper purpose here. There's – what we have is a record – Well, at some point they do accuse your client of having improper motives, which is getting this trailer parked cheap, essentially. Well, and that – And if that were true, I understand that they – that this sale was eventually vacated, but – rescinded. But I suppose that would be the kind of a motive which would violate the covenant of good faith and fair dealing or the discretion the world decide. Well, if, Your Honor, that sale had stood, it was set aside for lack of notice. There's a procedure under Oregon law for setting aside because it was – the foreclosing creditor did not realize enough on it. What's interesting here, just as a side note, is they're complaining about the amounts of money that were in that revoked sale, saying that the property was worth so much more. Well, if it was really worth so much more, somebody would have come along and paid a lot more than they did. This wasn't an exercise in trying to steal it. But you would agree conceptually that if there was a motive to do that, that that would violate the covenant of good faith and fair dealing, despite the fact that the statute says that you can do it for any reason. But you can't do it for that reason. If this record supported that, yes, but it doesn't. A couple of other things that are related. There's this suggestion that the judgment was all cleared up quickly in the spring of 1997 by the borrower. Well, not so fast. As already mentioned, they replaced a $185,000 obligation with $210,000 of debt secured by a property that they then forfeited to the new creditor. That's not improving one's financial condition. And what's going on is the SBA is evaluating this on an ongoing basis. They cancel further disbursements, the SBA does. They get a request to reconsider that or to reinstate. In light of this non-arm's length, not so advantageous transaction, the SBA says we're not going to reinstate the money. Then the borrower says, well, would you reconsider your decision? And by July of 97, the SBA says yes. And then there are 11 weeks with 22 documented interchanges or attempted communication between the SBA and the borrower. And the site to the record for that is pages 848, 854. Those are the notes of a loan officer named Dennis Willis. And what they reflect is an ongoing exchange of information between the agency and the borrower. The agency just didn't hang up the phone and say we're not going to pay attention to you for five months, which is what's suggested in the appellant's brief. And what those notes also reflect is the agency wasn't satisfied in the exercise of its discretion that things were really being taken care of. By late October, the agency receives a request from the borrower to subordinate its position to new debt from the Bank of Portland. And this is very important on the issue of good faith. By early December, SBA has signed two letters to the Bank of Portland and it has signed two subordination agreements where it agrees to put its loan position and its loans behind $800,000 of new debt. Now, the Bank of Portland ended up not doing that deal, but it's undisputed that the SBA was willing to do that. That's not something that an agency is doing if it's out to get the borrower. That is listening very closely to the borrower and saying we're still willing to work with you. I have about a minute left. If the Court has any further questions, I'd be happy to answer them. Now, on the withholding of the consent to sale, you abandon your position that you didn't have the ability or the right to deny permission to sell. The loan agreement says that sales can only be done with the consent of the agency. Now, were any of those requests for sales unconditional? That is, you were asked to consent to a sale that would diminish your security. Am I right on certain of these? Was there any of them a simple unconditional consent? No, Your Honor. And Judge Ashmanskas mentioned that in his opinion. There was no evidence that any of these proposed sales would result in a simple payoff of the entirety of the SBA loans. So every one of the consents to sale was coupled with an expectation that the loan would not be paid in full. Right. Am I right on that? Yes, Your Honor. I'll give you an example. There's an LPP agreed in I believe it was 2001. It agreed to take a discount, which it actually didn't have to do. I think it agreed to let the Klatsk and I property go for $560,000. And it said, but we want that money in four and a half months. They said in April, if we give you that discount and take the $560,000, we want the money by August 16th. Well, they didn't have to give a discount and they didn't have to give them four and a half months. The deal didn't come through. And there was never a deal that would have handed the SBA or LPP a check and said, you're paid off. Release our deed of trust. Thank you. Thank you very much. A quick minute. Thank you, Your Honor. Just briefly, in response to Judge Levy's question, counsel's response is incorrect. The Safley loan was one that would have, in fact, satisfied the entirety of the loan obligation that's referenced in our reply brief. In response to Judge Berzon's question about the guarantees, there's language in the guarantees at Record 179 that indicates that the definition of collateral includes all of the property, all of the property pledged on behalf of both the debtor and the grantor. So there's language that actually defines the concept of collateral for purposes of the guarantees that were given, and I think that definition answers the question that the Court posed. Where did you say that is? That was at Record, as an example, it's Record 179. In terms of the efforts in January of 1997, there was no evidence whatsoever that indicated that the Gardners were attempting to use the proceeds that were requested to satisfy the Klamath Falls Motel loan. Record 326, 327 so indicates in the letter, and there's also indication made in that letter from Ms. Randall to the SBA that the Gardners would have to take the Klamath Falls Motel back, indicating that the judgment was going to have to be handled in that fashion. Okay. You're over time, so. Thank you, Your Honor. I think the important thing I want to leave the Court with is at Record 531, there is an indication that there was an opinion from the very loan officer of the Small Business Administration indicating that with all of the information about the judgments that have been provided, that the prejudgment status of the parties should be reinstated. There's also indication that there was no effort made to evaluate the loans, the reinstatement effort, in light of this new information. I think we have it. All right. Thank you, Counsel. The case argued will be submitted.
judges: Leavy, Fisher, Berzon